UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BOTTEGA, LLC, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>NATIONAL SURETY CORPORATION-CHICAGO, IL,<br><br>    Defendant. | Case No.  21-cv-03614-JSC<br><br>**ORDER RE: MOTIONS FOR PARTIAL SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 64, 68 |

This lawsuit is an insurance coverage dispute.  BOTTEGA, LLC ("Bottega"), UNA MARCA, LLC dba OTTIMO ("Ottimo"), GRUPPO CHIARELLO, INC. ("Gruppo Chiarello"), and SOLO I O, Inc. ("Solo") (together, "Plaintiffs") sue NATIONAL SURETY CORPORATION ("National Surety") for breach of contract and breach of the implied covenant of good faith and fair dealing.  (Dkt. No. 1-1.)  Pending before the Court are cross-motions for partial summary judgment on whether each plaintiff has a qualifying claim for coverage under the policy's Business Income provision.  Having carefully considered the parties' briefing, and with the benefit of oral argument on January 10, 2025, the Court orders as follows: As to Bottega and Ottimo, the Court DENIES Plaintiffs' motion for partial summary judgment and DENIES National Surety's motion.  As to Gruppo Chiarello and Solo, the Court GRANTS National Surety's motion for partial summary judgment and DENIES Plaintiffs'.

## BACKGROUND

Bottega is a restaurant located at 6525 Washington Street, Yountville, California.  (Dkt. No. 64-20 at 6-7.)  Ottimo—a "[r]etail, cafe and catering" facility—is located at the same address. (*Id.* at 7-8.)  Gruppo Chiarello, a management company, has offices at the same Yountville address.  (*Id.* at 8-10; Dkt. No. 64-19 at 4.)  Gruppo Chiarello manages Bottega and Ottimo for a

5% fee. (Dkt. No. 64-20 at 8-10 (explaining Gruppo Chiarello gets 5% of Bottega and Ottimo's "[n]et revenue as determined by . . . general accounting principles").) Solo "is a holding company that receives discretionary distributions from Bottega . . . after salaries and other expenses of Bottega have been paid." (Dkt. No. 64-3 ¶ 7.)

The four plaintiff entities are listed as "named insured[s]" in a commercial insurance policy issued by National Surety. (Dkt. No. 64-8 at 16.) The policy provides for loss of Business Income due to the necessary suspension of operations:

> We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your **operations** during the **period of restoration**. The suspension must be caused by direct physical loss of or damage to property at the premises de-scribed in the Declarations . . . caused by or resulting from any Covered Cause of Loss.

(*Id.* at 78.) In addition, there is a Civil Authority provision which provides:

> We will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss. This coverage will apply for a period of up to two consecutive weeks from the date of that action.

(*Id.* at 79.)

On October 8, 2017, a series of fires began burning in Napa, Sonoma, and Yuba Counties ("North Bay Fires"). (Dkt. No. 64-22 at 2.)[1] The following day, the governor proclaimed a State of Emergency to exist in Napa, Sonoma, and Yuba Counties. (*Id.*) As part of the state of emergency, "various road closures [were] implemented from approximately October 9 to 18, 2017 that restricted access to the Insured Property." (Dkt. No. 64-3 ¶ 14.)

---

[1] The Court grants Plaintiffs' request to take judicial notice of the Proclamation of a State of Emergency located at Docket No. 64-22. (Dkt. No. 64-5.) *See U.S. ex rel. Modglin v. DJO Glob. Inc.*, 48 F. Supp. 3d 1362, 1381 (C.D. Cal. 2014), *aff'd sub nom. United States v. DJO Glob., Inc.*, 678 F. App'x 594 (9th Cir. 2017) ("Under Rule 201, the court can take judicial notice of public records and government documents available from reliable sources on the Internet, such as websites run by governmental agencies.") (cleaned up)).

2

The North Bay Fires did not reach Plaintiffs' businesses in Yountville but came "very close." (Dkt. No. 64-20 at 12.) Both Bottega and Ottimo closed on October 9, 2017. (Dkt. No. 64-17 at 21; Dkt. No. 64-18 at 18.) "The restaurants could not operate . . . as they were inundated with smoke soot, ash, and char." (Dkt. No. 64-3 ¶ 12.) Plaintiffs' employees "clean[ed] the Insured Property and ma[d]e partial/temporary repairs that were economically feasible so that Plaintiffs could at least partially resume business operations of the income producing entities, Bottega and Ottimo, as soon as possible." (Dkt. No. 64-3 ¶ 13.)

The restaurants partially reopened the following day, on October 10, 2017, "so that food could be provided and served to firefighters, PG&E workers and other personnel in the local area." (Dkt. No. 64-3 ¶ 13; Dkt. No. 68-1 at 21.) Bottega remained in operation throughout the North Bay Fires, aside from a closure on October 16, 2017. (Dkt. No. 64-18 at 18; 22-35.) Ottimo closed again from October 11 through 17 and reopened on October 18, 2017. (Dkt. No. 64-18 at 18, 22-36.)

On October 17, 2017, Plaintiffs submitted a Property Loss Notice. (Dkt. No. 68-1 at 144.) "In November 2017, National Surety paid Plaintiffs $108,190 for business income lost during the October 9, 2017 to October 18, 2017 time frame when civil authority prevented access to the Insured Premises." (Dkt. No. 64-21 at 4.)

Approximately a year after the North Bay Fires, a site inspection occurred. (Dkt. No. 64-9 at 3; 64-10 at 3.) A third party, Hygiene Technologies International, Inc., identified smoke damage. (Dkt. No. 64-10 at 3.) Following the site inspection, Plaintiffs submitted to National Surety claims for "smoke damage or air particulate damage . . . attribute[d] to the wildfire, as well as lost business income." (*Id.*) "With respect to [the] business income loss claim," Allianz Global Corporate & Specialty—on behalf of National Surety—responded:

> [B]eyond the Civil Authority claim, we regret to inform you that the Policy's Business Income coverage does not apply because Solo's operations were not suspended due to loss of or damage to insured property. Rather, Solo's operations were suspended during portions of the October 9, 2017 to October 18, 2017 period when access to the Insured Premises was prohibited by order of civil authority, as opposed to loss of or damage to insured property.

(Dkt. No. 64-10 at 3.)

3

In April 2021, Plaintiffs sued National Surety alleging breach of contract and breach of the implied covenant of good faith and fair dealing.[2] (Dkt. No. 1-1.) Plaintiffs contend they "continued to experience business income losses for an extended period of time well beyond the two-week time period provided for under the Civil Authority provision" and thus "are seeking to recover business income losses under the Policy's Business Income coverage provisions." (Dkt. No. 64 at 13.) The parties stipulated to file the pending cross-motions for partial summary judgment "solely to the issue of coverage under the subject insurance policy." (Dkt. No. 62.)

## DISCUSSION

### I.   LEGAL STANDARD

The burdens faced by opposing parties on cross motions for summary judgment "vary with the burden of proof they will face at trial." *First Pac. Networks, Inc. v. Atl. Mut. Ins. Co.*, 891 F.Supp. 510, 513 (N.D. Cal. 1995). "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co., Inc. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quotation marks omitted). In that case, the moving party "has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *Id.* If the party produces sufficient evidence on that score, "the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense." *Id.* (quotation marks omitted). If the opposing party "fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000). If the moving party would not bear the burden at trial, it can meet its summary judgment burden by (1) "produc[ing] evidence negating an essential element of the nonmoving party's case," or, (2) "after suitable discovery, . . . show[ing] that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Id.* at 1106.

---

[2] The parties stipulated to dismiss without prejudice Plaintiffs' claims against defendant ALLIANZ GLOBAL RISKS US INSURANCE COMPANY. (Dkt. No. 67.)

"[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001). In other words, the Court will consider all evidence in the record, regardless of whether a party identified it in support of or in opposition to a motion.

## II.   BUSINESS INCOME COVERAGE

The parties cross-move for partial summary judgment on the threshold question of whether each Plaintiff has a qualifying claim for coverage under the Business Income Coverage provision, which provides:

> We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your **operations** during the **period of restoration**. The suspension must be caused by direct physical loss of or damage to property at the premises de-scribed in the Declarations . . . caused by or resulting from any Covered Cause of Loss.[3]

(Dkt. No. 64-8 at 78.) So, to trigger the Business Income Coverage provision, Plaintiffs must establish (1) a suspension of operations (2) caused by (3) direct physical loss of or damage to the property, (4) resulting from a Covered Cause of Loss. Because National Surety contends none of the four plaintiffs satisfy the four requirements, the Court addresses each plaintiff in turn.

---

[3] In relevant part, the policy defines "operations" as "Your business activities occurring at the described premises." (Dkt. No. 64-8 at 85.) And the policy defines "Period of Restoration" as "the period of time that:"

> a. Begins with the date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises; and
>
> b. Ends on the date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality.

(*Id.*)

### A. Bottega

#### 1. Suspension of Operations

The summary judgment record establishes as an undisputed fact Bottega's operations were suspended within the meaning of the policy. The phrase "necessary suspension" requires "a *complete cessation* of [the insured's] business." *Buxbaum v. Aetna Life & Cas. Co.*, 103 Cal. App. 4th 434, 444 (2002). In *Buxbaum*, the insured—a law firm—was not entitled to benefits under the business income coverage provision because, as attorneys' time sheets indicated, "the law firm continued to provide legal services after the flood." *Id.* at 448-49. "[T]he firm may have functioned at less than normal capacity and with less than normal resources, but it continued to operate nonetheless." *Id.* at 448. Here, in contrast, Bottega's daily sales reports from October 2017 reveal Bottega closed completely on October 9 and 16, 2017. (Dkt. No. 64-17 at 21, 35.) National Surety acknowledges as much. (Dkt. No. 68 at 7 ("Bottega [was] closed on . . . October 9, 2017 . . . and was closed on October 16, 2017.").) So, National Surety's citation to *Keetch v. Mutual of Enumclaw Insurance Co.,* 66 Wash. App. 208 (1992), is unavailing. The *Keetch* court determined the insured motel was not entitled to business interruption coverage following a volcanic eruption because the motel remained open with "the same number of rooms available both before and after the eruption." *Id.* at 212. But here, on this record, every reasonable juror would find Bottega completely ceased operations on at least October 9, 2017.

#### 2. Direct Physical Loss or Damage

The summary judgment record establishes as a matter of undisputed fact the North Bay Fires caused direct physical loss and damage to Bottega. To trigger coverage, "there must be some *physicality* to the loss . . . of property—*e.g.*, a physical alteration, physical contamination, or physical destruction." *Inns-by-the-Sea v. California Mut. Ins. Co.*, 71 Cal. App. 5th 688, 707 (2021) (quoting *Oral Surgeons, P.C. v. Cincinnati Ins. Co.*, 2 F.4th 1141, 1144 (8th Cir. 2021)). In response to Plaintiffs' Requests for Admission, National Surety admitted the following: (1) "the FIRES caused smoke, soot and/or ash damage to the INSURED LOCATIONS"; (2) the FIRES caused a direct physical loss of the INSURED LOCATIONS"; and (3) "the FIRES caused direct physical damage to the INSURED LOCATIONS." (Dkt. No. 64-14 at 4.) These responses

conclusively establish direct physical loss and damage.  *See* Fed. R. Civ. P. 36(b).

Moreover, National Surety's admissions are consistent with case law recognizing "[c]ontamination of a structure that seriously impairs or destroys its function may qualify as direct physical loss." *Id.* at 701-703 (collecting cases in which "the presence of noxious substances and odors . . . rendered real property uninhabitable or unable to be used as intended"); *see also Oregon Shakespeare Festival Ass'n v. Great Am. Ins. Co.*, No. 1:15-CV-01932-CL, 2016 WL 3267247, at *9 (D. Or. June 7, 2016), *vacated by agreement,* No. 1:15-CV-01932-CL, 2017 WL 1034203 (D. Or. Mar. 6, 2017) (concluding harmful air quality inside the insured theater resulting from wildfire smoke constituted physical damage, even though the property did not incur any permanent or structural damage).

National Surety inexplicably ignores its responses to the Requests for Admissions and contends the North Bay Fires did not cause physical loss or damage.  In support of its argument, National Surety cites COVID-19 cases "reject[ing] the claim that the need to clean the business premises during and after the business closure met the plaintiff's burden of showing physical loss or damage." (Dkt. No. 73 at 8-9.)  Because National Surety's admissions conclusively establish physical loss or damage, the Court need not address this argument.  But even absent National Surety's admissions, the COVID-19 cases National Surety cites are unpersuasive because courts distinguished COVID-19—a virus that can be disinfected—from noxious substances and fumes that physically alter property:

> [T]he presence of COVID-19 on Plaintiff's property did not cause damage to the property necessitating rehabilitation or restoration efforts similar to those required to abate asbestos or remove poisonous fumes which permeate property.  Instead, all that is required for Plaintiff to return to full working order is for the [government orders and restrictions to be lifted].

*Inns-by-the-Sea v. California Mut. Ins. Co.*, 71 Cal. App. 5th 688, 704 (2021) (quoting *First & Stewart Hotel Owner, LLC v. Fireman's Fund Ins. Co.*, No. 2:21-CV-00344-BJR, 2021 WL 3109724, at *4 (W.D. Wash. July 22, 2021)); *see also Out W. Rest. Grp. Inc. v. Affiliated FM Ins. Co.*, 527 F. Supp. 3d 1142, 1150 n.1 (N.D. Cal. 2021), *aff'd and remanded*, No. 21-15585, 2022

7

WL 4007998 (9th Cir. Sept. 2, 2022) (whereas "asbestos-containing building materials are physically linked with or physically incorporated into the building and therefore physically affect tangible property[,] . . . COVID-19[] . . . can be disinfected and cleaned") (cleaned up); *Colgan v. Sentinel Ins. Co., Ltd.*, 515 F. Supp. 3d 1082, 1087 n.4 (N.D. Cal. 2021) (distinguishing COVID-19 from "some physical contamination that rendered a property uninhabitable"). Whereas a virus is more like dust and debris that can be removed through cleaning, *see Mama Jo's, Inc. v. Sparta Ins. Co.*, No. 17-CV-23362-KMM, 2018 WL 3412974, at *9 (S.D. Fla. June 11, 2018), *aff'd,* 823 F. App'x 868 (11th Cir. 2020), smoke is more like asbestos and gases that physically alter property.

### 3. Covered Cause of Loss

Third and relatedly, the summary judgment record establishes as an undisputed fact the direct physical loss or damage resulted from a Covered Cause of Loss. In Plaintiffs' insurance policy, "Covered Causes of Losses" include "Smoke causing sudden and accidental loss or damage." (Dkt. No. 64-8 at 71.) Because National Surety admitted "the FIRES caused smoke . . . damage" to the insured properties, (Dkt. No. 64-14 at 4), this element is satisfied. (Dkt. No. 73 at 8 ("National Surety does not dispute" the "existence of minor smoke-related damage" at Bottega.").)

### 4. Causal Connection

The coverage dispute boils down to whether a reasonable trier of fact can or must find a causal connection between the smoke damage and Bottega's suspension of operations on at least October 9, 2017. In accordance with the policy language, the suspension of operations "must be *caused by* direct physical loss of or damage to property." (Dkt. No. 64-8 at 78 (emphasis added).) If Plaintiffs produce evidence from which a reasonable juror could infer a causal connection between the smoke damage and Bottega's closure, then National Surety's motion for partial summary judgment must be denied. If National Surety identifies evidence from which a reasonable juror could conclude Bottega closed for reasons other than physical loss or damage, then Plaintiffs' motion for partial summary judgment must be denied. Only if there is no genuine dispute of fact as to the reason for the closure can the Court grant either party's motion.

8

In this case, there is a genuine dispute of fact as to the reason for Bottega's closure on October 9, 2017. Plaintiffs adduced evidence from which a reasonable juror could conclude smoke, ash, and/or soot damage caused the suspension of operations at Bottega. Michael Chiarello, the 30(b)(6) witness and owner of Plaintiff businesses, testified Bottega closed because the "facility prevented customers from coming . . . because it smelled like an ashtray." (Dkt. No. 64-20 at 36-37.) Similarly, David O'Malley, who served as Bottega's Director of Operations at the time of the North Bay Fires, attests "Bottega . . . business operations completely ceased on these dates in October 2017 as a direct result of the smoke, soot and/or ash damage to the Insured Property from the North Bay Fires."[4] (Dkt. No. 64-3 ¶ 12.) He continues: "The restaurants could not operate in their then condition as they were inundated with smoke soot, ash, and char. The restaurants similarly could not serve customers in their then condition." (*Id.*; (Dkt. No. 64-9 at 1 (November 11, 2017 email from former employee of insured stating "The smoke was very thick in and around the insured locations making it difficult to breath [sic], burning the eyes, nose and throat as well as permeating [Furniture Fixtures and Equipment] in the insured locations.").)

Further, when Bottega opened on October 10, 2017, "it was partially." (Dkt. No. 64-20 at 33.) The restaurant "could only seat a portion less than a third of the restaurant, 60 seats, of 180-seat restaurant" because that section was "the only place [employees] could get clean enough the guests would come." (*Id.*) For several months following the fires, Bottega employees regularly cleaned the walls and upholstery to remove the smell of smoke, soot, and ash. (Dkt. No. 64-19 at 3, 24-25.) The upholstery was eventually replaced because it "had remnants of the smoke, soot, and ash" from the fire. (*Id.* at 28-29.) And for at least two years after the fire, the smell of smoke remained. (Dkt. No. 64-20 at 31.)

Because Plaintiffs produced sufficient evidence demonstrating Bottega's suspension of

---

[4] National Surety objects to this and similar testimony by Mr. O'Malley, arguing "Lack of foundation that October 2017 closures were due to fire damage, as opposed to Civil Closure Order." (Dkt. No. 68 at 18.) The objection is overruled. Mr. O'Malley began working as the Director of Operations of Bottega in 2012. (Dkt. No. 64-3 ¶ 2.) Since 2018, he has been Chief Operating Officer and Partner of Gruppo Chiarello. (*Id.*) Mr. O'Malley was physically present at the restaurant on October 9, 2017, and worked with Mr. Chiarello and other employees to clean and repair the properties following the fires. (*Id.* ¶ 13; Dkt. No. 69-1 ¶ 13.) As such, Mr. O'Malley's testimony about why Bottega closed is supported by personal knowledge.

9

operations was caused by direct physical loss of or damage resulting from smoke, the burden moves to National Surety to "present significant probative evidence tending to support its claim." *C.A.R. Transp. Brokerage*, 213 F.3d at 480. National Surety contends "operations were suspended . . . when access to the Insured Premises was prohibited by order of civil authority, as opposed to loss of or damage to insured property." (Dkt. No. 64-10 ¶ 7.) In support of its theory, National Surety observes Bottega closed on October 9, 2017—the same day the governor issued the Public Safety Order. That the two events coincided is not sufficient to create a genuine dispute of fact. The Public Safety Order was "implemented from approximately October 9 to 18, 2017." (Dkt. No. 64-3 ¶ 12.) Bottega reopened on October 10, 2017 while the Public Safety Order was still in place. In light of Bottega's reopening, this case is distinct from the COVID-19 cases where the insured was not entitled to business income coverage because government orders—not the virus—caused the insured to suspend operations:

> [T]he lack of causal connection between the alleged physical presence of the virus on [the insured's] premises and the suspension of [the insured's] operations can be best understood by considering what would have taken place if [the insured] had thoroughly sterilized its premises to remove any trace of the virus after the Orders were issued. In that case, [the insured] would *still* have continued to incur a suspension of operations because the Orders would *still* have been in effect and the normal functioning of society *still* would have been curtailed.

*Inns-by-the-Sea,* 71 Cal. App. 5th at 704; *see also Los Angeles Lakers, Inc. v. Fed. Ins. Co.*, 591 F. Supp. 3d 672, 679 (C.D. Cal.) ("Even if the Virus had *never* been present at the [insured property], the applicable governmental orders would have closed it and, then, dictated when it could reopen.").

National Surety also argues the fact Bottega reopened on October 10, 2017 and "remained in operation throughout the Fires, except for October 16, and at all times after the Fires, prov[es] that ash, soot and smoke did not cause it to cease operations at any time." (Dkt. No. 68 at 12.) In doing so, Bottega identifies a lack evidence regarding what cleaning and repairs Plaintiffs completed on October 9, 2017; what time Bottega opened on October 10, 2017; and whether Bottega could have opened earlier, for example, for dinner service on October 9, 2017. While Plaintiffs present significant evidence about cleaning efforts that occurred in the days and months

10

1  following the fire, (Dkt. No. 64-20 at 13-17 (describing cleaning that occurred between October 9
2  and 18, 2017); *id.* at 17-30 (describing cleaning that continued for over a year after the fire); Dkt.
3  No. 64-19 at 3 (describing cleaning that occurred from approximately December 2017 to January
4  2018); 12 (same); 24-25 (same)), the evidence does not specify what cleaning was required to re-
5  open Bottega and when that cleaning was completed.  Put another way, Bottega's reopening on
6  October 10, 2017 creates a genuine dispute of fact as to the reason Bottega closed the previous
7  day.  There are inferences to be drawn in Plaintiffs' favor: a reasonable trier of fact could conclude
8  the smoke damage was at its worst on October 9, 2017, immediately following the outbreak of the
9  fire; or one day of cleaning was enough to make the restaurant serviceable; or despite the smoke
10 damage, Bottega reopened in an effort to mitigate its damages and to serve firefighters, PG&E
11 workers, and other first responders willing to tolerate it.  (Dkt. No. 68-1 at 21-22 (noting when
12 Bottega reopened, "the business was PG&E, and every firefighter, in the valley . . . [n]ot [the
13 restaurant's] guests").)  But given the dearth of evidence about Plaintiffs' activities at Bottega on
14 October 9 and 10, 2017, there are also inferences to be drawn in National Surety's favor; for
15 example, that Bottega's closure on October 9, 2017 was caused by a lack of customers or general
16 disorder following the fire and not physical damage to the property.
17   Moreover, as National Surety observes, although Plaintiffs claim Bottega's "awning was
18 damaged in the 2017 fires due to the smoke, soot, and ash," Bottega did not replace the awning
19 until December 2022 pursuant to the landlord's demand.  (Dkt. No. 68-1 at 57-59.)  From the
20 approximately five-year delay, a reasonable trier of fact could infer the October 9, 2017 closure
21 was not due to smoke damage.
22   Because there is a genuine dispute of fact as to whether Bottega's closure was caused by
23 smoke damage, the Court DENIES National Surety' motion for partial summary judgment and
24 DENIES Plaintiffs' motion for partial summary judgment.
25   **B.   Ottimo**
26   In deciding whether the Business Income Provision is triggered as to Ottimo, the Court
27 applies the same four-part test.  The Ottimo analysis resembles the above analysis for Bottega.
28 First, as the October 2017 sales reports reveal, Ottimo completely suspended its operations,

11

closing on October 9, 2017 and October 11 through 17, 2017.  (Dkt. No. 64-18 at 18; 22-35.)  Second, in accordance with National Surety's admissions, (Dkt. No. 64-14 at 4), the North Bay Fires caused physical damage and loss.  Third, the physical damage and loss resulted from a Covered Cause of Loss under the policy: smoke.  (Dkt. No. 64-8 at 71.)

As to whether Ottimo's suspension of operations was caused by smoke damage, there is a dispute of fact.  On one hand, as recounted above, there is evidence supporting an inference smoke damage caused Ottimo's closure.  (Dkt. No. 64-20 at 36-37 (the "facility prevented customers from coming . . . because it smelled like an ashtray)"; Dkt. No. 64-3 ¶ 12 ("The restaurants could not operate in their then condition as they were inundated with smoke soot, ash, and char.").)  On the other hand, there is evidence Ottimo's closure was a business decision necessitated by finance and staffing shortages, not physical damage from smoke, soot, and ash.  When asked why he did not open Ottimo the same time he opened Bottega, Mr. Chiarello attested he "didn't have the money."  (Dkt. No. 68-1 at 33.)  In light of the lack of staff and money, and because Ottimo was a "bigger facility" in which "every retail product had to be cleaned and wiped," Mr. Chiarello opted to open Bottega before Ottimo:

> Q. When you say you could not open both [Bottega and Ottimo], can you explain to me what you mean by that?
> A.  I ran out of money.
> Q. I guess what I'm asking is –
> A. I ran out of money to pay people to be able to do something more than what we were doing. I ran out of money.
> Q. So you did not have the money to open Ottimo on October 19, 2017?
> A. At the same time [as Bottega], correct. I didn't have the hands to do both, because many people suffered during the fires and a third of my crew could not come back because they're relocating because their house was burned down. I opened what I could pay for.

(Dkt. No. 68-1 at 22.)  Moreover, following the fire, Ottimo did not claim property damage to upholstery and fabrics; its only claim was for repainting the walls, which had yet to be done as of June 2024.  (Dkt. No. 68-1 at 51.)  In light of this dispute of fact as to whether smoke damage caused the suspension of operations at Ottimo, the Court DENIES Plaintiffs' and National Surety's motions for partial summary judgment as to Ottimo.

12

### C. Gruppo Chiarello

National Surety seeks partial summary judgment as to Gruppo Chiarello—the management company for Bottega and Ottimo—on the ground it never ceased operations. The evidence establishes as a matter of undisputed fact that Gruppo Chiarello did not cease operations. When asked whether Gruppo Chiarello's operations shut down, Mr. Chiarello testified the company "continued the management business during the wildfires." (Dkt. No. 68-1 at 36.) Moreover, Gruppo Chiarello manages two properties in addition to Bottega and Ottimo. (Dkt. No. 64-20 at 8-9.)

Plaintiffs fail to provide evidence to meet their summary judgment burden or create a genuine dispute of fact. Plaintiffs observe "Gruppo Chiarello's business income is directly linked to Bottega and Ottimo's ability to operate as restaurants and have their doors open to serve customers." (Dkt. No. 64 at 6.) But Plaintiffs provide no legal authority to support the required inference that the suspension of operations at a managed business constitutes a suspension of operations for the managing company—particularly in the face of evidence that the managing company, which manages two additional properties, continued to operate.

Because the undisputed evidence negates an essential element of Plaintiffs' case—that Gruppo Chiarello ceased operations—the Court enters summary judgment in favor of National Surety as to Gruppo Chiarello. Drawing all inferences in Plaintiffs' favor, Gruppo Chiarello is not entitled to coverage under the Business Income Provision.

### D. Solo

National Surety seeks partial summary judgment as to Solo on the ground it never ceased operations. Solo "is a holding company that receives discretionary distributions from Bottega." (Dkt. No. 64-3 ¶ 7.) The summary judgment record contains no evidence Solo suspended operations, and as with Gruppo Chiarello, Plaintiffs' assertion that Solo's income depends on Bottega and Ottimo's does not mean Solo suspended *its* operations. So, the Court enters summary judgment in favor of National Surety as to Solo. Drawing all inferences in Plaintiffs' favor, Solo is not entitled to coverage under the Business Income Provision.

13

**CONCLUSION**

For the reasons stated above, as to Bottega and Ottimo, the Court DENIES Plaintiffs' motion for partial summary judgment and DENIES National Surety's motion. As to Gruppo Chiarello and Solo, the Court GRANTS National Surety's motion for partial summary judgment and DENIES Plaintiffs'.

By close of business on January 13, 2025, the parties shall file a stipulation with a proposed schedule through trial that includes the mediation date.

This Order disposes of Dockets Nos. 64 and 68.

**IT IS SO ORDERED.**

Dated: January 10, 2025

JACQUELINE SCOTT CORLEY
United States District Judge